COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-406-CR

 

 

LYDIA H. GROTTI                                                                APPELLANT

A/K/A
LYDIA GROTTI

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 372ND DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

  OPINION
ON STATE=S
PETITION FOR DISCRETIONARY REVIEW

 

                                              ------------

Pursuant to rule of appellate
procedure 50, we have reconsidered our previous opinion on the State=s petition for discretionary review. 
See Tex. R. App. P.
50.  We withdraw our judgment and opinion
dated September 14, 2006 and substitute the following primarily to revise the
factual sufficiency standard of review to comport with the court of criminal
appeals=s opinion in Watson v. State, No. PD-469-05, 2006 WL 2956272,
at *8 (Tex. Crim. App. Oct. 18, 2006), which was handed down after our original
opinion issued.








I. 
Introduction

A grand jury
indicted appellant Lydia H. Grotti (AGrotti@), a former
physician at John Peter Smith Hospital (AJPS@) in Fort
Worth, for the murder of her patient, Lettie McGhee (AMcGhee@).  The indictment alleged that Grotti murdered
McGhee by occluding McGhee=s endotracheal tube (AET tube@) with her
finger.  A jury subsequently acquitted
Grotti of murder and manslaughter but convicted her of the state jail felony of
criminally negligent homicide and affirmatively found that she used her finger
as a deadly weapon.  The trial court
sentenced Grotti to two years= confinement.  Grotti raises
seven issues on appeal, including arguments that the evidence is insufficient
to demonstrate that McGhee was alive at the time Grotti occluded McGhee=s ET tube and that she caused McGhee=s death.  Whether McGhee was
alive when Grotti occluded the ET tube is the critical issue in this homicide
prosecution.  Because we hold that the
evidence is factually insufficient to show that McGhee was alive when Grotti
occluded McGhee=s ET tube,
we reverse the trial court=s judgment and remand the case for a new trial.

II.  Factual and Procedural Background








McGhee, a sixty-four-year-old
obese woman, visited JPS on the night of December 24, 2000, and into the
following day.  She complained of
constant abdominal pain occurring over the previous three weeks, coughing occurring
over the previous two to three weeks, and nausea.  JPS staff subsequently conducted a number of
exams on McGhee before sending her home on December 25, 2000.  The impression from her radiology report
indicated Apossible
mucinous or serous cystadenocarcinoma of an ovary with possible metastases to
the liver and chest.@  In other words, physicians opined that McGhee
had metastatic ovarian cancer that had spread to her liver and lungs and to
some of her bones.








McGhee returned to the JPS
emergency room (the AER@) sometime in the early evening on the following day complaining of a
persistent cough.  She waited to be
treated in the ER after JPS staff appropriately triaged her.  Approximately two hours later, McGhee=s daughter approached Leigh Taylor, an emergency medical technician (AEMT@) working at
the ER front desk, and told Taylor that she needed help because something was
wrong with her mother.  Taylor looked
into the waiting room and observed McGhee slumped over in a wheelchair.  Taylor determined that McGhee was
unresponsive, did not have a detectable pulse, and showed no observable signs
of life.  With the help of a triage nurse
and a male technician, Taylor transported McGhee back to a trauma room within a
few minutes and began a Acode,@ which was documented on a Acode sheet.@[1]  The code sheet indicates that
McGhee was Afound@ at 19:45 and that efforts to resuscitate her began at 19:48.[2]  McGhee had suffered a cardiac arrest.[3]








Taylor, Donald McGraw, M.D.,
Alan Eli, M.D., Jennifer Lovins, a registered nurse, Kim Short, an EMT,
Michelle Martin, a registered nurse, Donna Duclow, a registered nurse, Eva
Murray, an ER charge nurse, Christi Bergland, an ER charge nurse, and Dennis
Hunt, a respiratory therapist, all participated in the code and immediately
began full Advanced Cardiac Life Support (AACLS@)Cthe performing of cardiopulmonary resuscitation (ACPR@), the
delivery of drugs through an IV, intubation, and defibrillation.  Specifically, the code team hooked McGhee up
to an electrocardiogram monitor at 19:48 to determine her heart rhythm, which
was initially identified as ventricular fibrillation (AV-fib@).[4]  Dr. Eli intubated McGhee at 19:57 by
inserting an ET tube to establish an airway to facilitate McGhee=s breathing process.  The code
team administered defibrillation (electrical shocks) fifteen times over the
course of the entire code.  This occurred
twice at 19:48, once at 19:50 and 19:51, twice at 19:52, once at 20:00, 20:02,
and 20:04, twice at 20:08, once at 20:10, twice at 20:12, and once at
20:13.  The code team also administered
seven doses of epinephrine and multiple doses of lidocaine, atropine, dopamine,
and a dose of amniarodone, all of which were intended to stimulate the heart
and obtain or raise blood pressure.








McGhee had no detectable
blood pressure or pulse and took no spontaneous respirations[5]
for the first twenty-seven minutes of the code, according to the code
sheet.  McGhee=s rhythm was either V-fib, V-tach, or PEA during this period.  At 20:08, McGhee=s rhythm was Aasystole,@ meaning an absence of any electrical activity in the heart.[6]  At 20:16, the code team palpated a pulse[7]
and detected a heart rate of ninety beats per minute.  McGhee established a Asinus@ rhythm at
20:18 and was put on a ventilator.[8]








Once McGhee was exhibiting a
sinus rhythm and was stabilized to a certain extent, Dr. McGraw called Grotti
to consult with her regarding admitting McGhee to the Intensive Care Unit (AICU@).[9]  Grotti arrived at the ER shortly thereafter
to assess McGhee and to determine whether she should be transferred to the
ICU.  McGhee, however, lost a sinus
rhythm and a pulse.  At 20:34, McGhee=s code sheet indicated that her rhythm was PEA and that she did not
have a palpable pulse.  Dr. McGraw
explained that they had been working the code for about forty-five minutes, and
Grotti commented that McGhee had Alost any chance at recovery@ and that McGhee was either brain dead or that she would probably be
pronouncing McGhee brain dead the following morning or within twenty-four
hours.  Grotti concluded that McGhee was
not stable enough for transfer to the ICU, and she returned to the ICU with
instructions to call her if McGhee became stable.

Dr. McGraw continued the code
after Grotti returned to the ICU.  McGhee
once again regained a sinus rhythm and a palpable pulse with a heart rate of
ninety-seven beats per minute.  Dr.
McGraw summoned Grotti a second time to return to the ER and assess McGhee for
admission to the ICU.  Shortly before
20:50, Grotti returned and assumed care of McGhee, and Dr. McGraw left the
trauma room to attend to other patients.








Grotti assessed McGhee.  McGhee still did not have a blood pressure,
and she did not have a radial or femoral pulse. 
Grotti did, however, detect a carotid pulse, but she described it as Athready@[10] before announcing to the code team that it had Agone away.@  Grotti ended, or Acalled,@ the code
and discontinued the IV, disconnected the ventilator, and pronounced McGhee
dead at 20:50 because, according to Grotti, McGhee had lost a pulse, had no
spontaneous respirations, and had no blood pressure.  The code sheet at this time indicated that
McGhee had a Abrady@[11] rhythm, a palpable pulse, a heart rate in the sixties, no blood
pressure, and no respirations.  The code
had lasted for just over sixty minutes.

Immediately after Grotti
called the code, Nurse Lovins observed McGhee=s chest Arising and
falling,@ saw condensation in the ET tube, and thought that McGhee was Abreathing.@  Taylor, Nurse Martin, and Short also observed
McGhee=s chest Arising and
falling@ and thought that McGhee was Abreathing.@ Grotti,
however, explained that the respirations were Aagonal@ and
testified that McGhee made no attempt to breathe after several minutes.  According to Grotti,

[t]he
air from the ventilator had pushed air and the patient=s
lungs came out and the patient did nothing after that. . . .  She did not make any attempt to breathe
in.  The air came out, it was like
(gesturing) and then nothing.

 








Grotti reported McGhee=s death to the medical examiner at 21:00 and called Life Gift at
approximately 21:20.[12]  She requested permission from the medical
examiner to remove McGhee=s ET tube
because, in her opinion, the ET tube was prolonging McGhee=s Aagonal
activity@ and removal of the ET tube would naturally collapse McGhee=s airway tissues inward, thus ending the agonal respirations.  The medical examiner denied her permission to
remove the ET tube.








Grotti then spoke to members
of McGhee=s family
briefly before returning to the ER. 
There, Nurse Martin told Grotti that McGhee was Abreathing,@ so Grotti
examined McGhee once again.  McGhee did
not have a pulse, she did not have any heart sounds, and she had fixed eyes and
dilated pupils and nonresponsive corneal reaction, which, in Grotti=s opinion, indicated neurological dysfunction, particularly in the
upper brain stem and lower midbrain. 
Grotti also examined McGhee for breath sounds because Ashe was making respiratory effort@ and because there was condensation in McGhee=s ET tube.  According to Grotti,
McGhee was getting air into her central airways but not into her lungs.  She explained to Nurse Martin that McGhee had
been hyperoxygenated and that her brain stem was continuing to fire, causing
muscle contractions to open up her airway and move air.  Grotti opined that McGhee was
cardiopulmonarily dead and that the movements that Nurse Martin observed were
agonal respirations or spinal reflexes only. 
Grotti described the agonal respirations as the Alast gasps of a dying brain stem.@  Short, however, testified that
she examined McGhee after Grotti called the code and that she detected a pulse
in two different places.  She could not
identify when she detected the pulses.

Grotti examined McGhee a few
more times thereafter.  Although there
was Asome electrical activity@ on the monitor, Grotti detected no heart sounds or pulses, and McGhee=s Arespiratory
activity@ became slower with each examination. 
Shortly before 21:50, McGhee=s respirations had slowed down to three or four per minute, according
to Grotti.  One of the nurses asked how
long this activity was going to continue, and Grotti explained that Ait could go on for minutes or it could go on for an hour . . . because
the [ET] tube was splitting her airway open.@ 








At 21:50, Grotti occluded[13]
McGhee=s ET tube with her finger. 
McGhee=s head and
neck Amoved@ during the
ET tube=s occlusion.  Michael Kasschau,
M.D., a resident in the JPS ICU, entered the trauma room during this time and,
after having spoken with Grotti for five to ten minutes, observed her occlude
McGhee=s ET tube for Aa solid five
minutes@ as they continued their conversation. 
Dr. Kasschau recounted that Grotti told him that Athis is something that she had seen done in her fellowship.@  Nurse Berglund entered the
trauma room and also observed Grotti occluding McGhee=s ET tube.

Grotti herself admitted that
she occluded McGhee=s ET
tube.  In a letter to the Texas State
Board of Medical Examiners (the ABoard@), Grotti
stated,

The
[ET tube] was prolonging the agony for the family and the E[R] staff who wanted
the patient moved somewhere else, there was no room.  Instead of removing the [ET tube], which the
Medical Examiner did not want us to do, I occluded the [ET tube] for approx.
one minute.  The agonal movements of the
head and neck occurred three to four times during that minute and ceased.  This occur[r]ed approx. one hour after the
patient was pronounced dead, with no clinically detectable cardiac function.

 

McGhee=s rhythm went asystole after Grotti occluded the ET tube. McGhee=s death certificate lists her time of death as 20:50 on December 26,
2000.  The medical examiner did not
perform an autopsy, and the manner of death is listed as Anatural.@ 

Kevin Wacasey, M.D., a former
ER physician at JPS, had previously expressed concerns about the JPS ER,
including issues involving patient volume and patient wait times.  He learned about the incident involving
Grotti and McGhee on December 27, 2000, and later reported Grotti=s actions that night to the Fort Worth Police Department.  She was subsequently indicted for murder.








At trial, Grotti pleaded not
guilty to the offenses alleged in the indictment and not true to the deadly
weapon allegation.  Several expert
witnesses testified, offering their opinions as to whether McGhee was alive or
dead when Grotti occluded McGhee=s ET tube.  In addition to
murder and manslaughter instructions, the trial court included a criminally
negligent homicide instruction in its charge to the jury.  The jury ultimately convicted Grotti of
criminally negligent homicide, and this appeal followed.

In addition to her
evidentiary sufficiency challenges, Grotti argues that there was no evidence to
prove that she committed a Agross deviation@ from the
standard of care, that the trial court erred by instructing the jury on the
offense of criminally negligent homicide, that the prosecutor=s violation of an in limine order was prejudicial prosecutorial
misconduct, that the opinions offered by the State=s experts were based on conjecture, not fact, and that her prosecution
violated the constitutional prohibition against double jeopardy.     

III.  Sufficiency
of the EvidenceC

Was McGhee Alive When Grotti Occluded Her ET Tube?

 








In her first issue, Grotti
argues that the evidence is insufficient to show that McGhee was alive when she
allegedly caused McGhee=s
death.  She states that A[i]n most homicide cases, the evidence that the decedent was alive
before the homicide occurred is abundantly clearCnot so in this case.@  Grotti contends that because
the jury found that she caused McGhee=s death by occluding McGhee=s airway with her finger, a deadly weapon, it was the State=s burden to prove that McGhee was alive at 21:50, the time of the ET
tube occlusion.

A person commits criminal
homicide if he intentionally, knowingly, recklessly, or with criminal
negligence causes the death of an individual. 
Tex. Penal Code Ann. ' 19.01(a) (Vernon 2003).  The
penal code defines an Aindividual@ as a human being who is alive. 
Id. ' 1.07(a)(26)
(Vernon Supp. 2006). A Abut for@ causal connection must be established between the defendant=s conduct and the resulting harm. 
Id. ' 6.04(a)
(Vernon 2003); Robbins v. State, 717 S.W.2d 348, 351 (Tex. Crim. App.
1986).  

A causal connection must have
been established between Grotti=s conduct of occluding McGhee=s ET tube and the harm that allegedly resulted therefromCMcGhee=s
death.  If McGhee was not alive when
Grotti occluded her ET tube, then Grotti could not have caused her death. We
therefore examine the evidence to determine if it is legally and factually
sufficient to demonstrate that McGhee was alive at 21:50 so that Grotti=s act of occluding McGhee=s ET tube caused her death.[14]








A.  Standards of Review

In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).








The sufficiency of the
evidence should be measured by the elements of the offense as defined by the hypothetically
correct jury charge for the case.  Malik
v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Bowden v. State,
166 S.W.3d 466, 470 (Tex. App.CFort Worth 2005, pet. ref=d).  Such a charge would be one
that accurately sets out the law, is authorized by the indictment, does not
unnecessarily restrict the State=s theories of liability, and adequately describes the particular
offense for which the defendant was tried. 
Gollihar v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik,
953 S.W.2d at 240.  The law as
authorized by the indictment means the statutory elements of the charged
offense as modified by the charging instrument. 
See Curry v. State, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).








In contrast, when reviewing
the factual sufficiency of the evidence to support a conviction, we view all
the evidence in a neutral light, favoring neither party.  Watson, 2006 WL 2956272, at *8; Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s
determination is manifestly unjust.  Watson,
2006 WL 2956272, at *8, 10; Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000).  To reverse under the
second ground, we must determine, with some objective basis in the record, that
the great weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
2006 WL 2956272, at *10.

In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@ Johnson, 23 S.W.3d at 8. 
Thus, we must give due deference to the fact-finder=s determinations, Aparticularly those determinations concerning the weight and
credibility of the evidence.@  Id. at 9.








An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  Moreover, an opinion reversing and remanding
on factual insufficiency grounds must detail all the evidence and clearly state
why the finding in question is factually insufficient and under which
ground.  Goodman v. State, 66
S.W.3d 283, 287 (Tex. Crim. App. 2001); Johnson, 23 S.W.3d at 7.

As an intermediate court of
appeals, our decisions are conclusive on all questions of fact brought before
us on appeal.  See Tex. Const. art. V, ' 6; Goodman, 66 S.W.3d at 301-02 (Womack, J., dissenting).

B.  Definition of Death








Because a homicide requires
the death of an Aindividual@ and the Texas Penal Code defines an Aindividual@ as one Awho is alive,@ the State
was required to show that McGhee was alive at the time Grotti allegedly caused
her death.  See Tex. Penal Code '' 1.07(a)(26), 19.01(a).  However,
the Texas Penal Code does not define the term Adeath@ other than
with respect to unborn children,[15]
and the trial court did not include a definition of death in its charge to the
jury.  Because the nature of this
specific sufficiency examination is inherently dependent upon the definition
and application of the term Adeath,@ we must
first determine whether the definition attributed to that term by both parties
in this case would have been included in a hypothetically correct charge.  See id. ' 19.01(a); Malik, 953 S.W.2d at 240. 

The record demonstrates that
both of the parties presented evidence under the assumption that section
671.001(a) of the Texas Health and Safety Code was the applicable and
appropriate definition of death to be used during trial.  Titled, AStandards Used in Determining Death,@ section 671.001 provides in part the following:

(a) A person is dead when, according to ordinary
standards of medical practice, there is irreversible cessation of the person=s
spontaneous respiratory and circulatory functions.

 

(b) If artificial means of support preclude a
determination that a person=s spontaneous respiratory and
circulatory functions have ceased, the person is dead when, in the announced
opinion of a physician, according to ordinary standards of medical practice,
there is irreversible cessation of all spontaneous brain function.  Death occurs when the relevant functions
cease.








Tex. Health & Safety
Code Ann. ' 671.001(a), (b) (Vernon 2003).[16]  Section 671.001(a) addresses cardiopulmonary
death, and section 671.001(b) addresses brain death.  Id. 
During his questioning, Grotti=s counsel studiously asked numerous witnesses, without objection by
the State, to assume that the following definition of death be applied, which
tracks the language of section 671.001(a) verbatim:

A
person is dead when, according to ordinary standards of medical practice, there
is an irreversible cessation of the person=s spontaneous respiratory and
circulatory functions.  

 








The charge included no specific instruction on
the definition of death, and none was requested by either the State or
appellant.  There is, however, no
evidence in the record that the jury considered any alternative definition of
death, and neither party challenged in this appeal the definition of death used
at trial nor its omission from the charge given by the trial court.  See Tex.
Code Crim. Proc. Ann. art. 36.14 (Vernon Supp. 2006) (requiring
defendant to specifically object in writing to jury charge).  

While the court of criminal
appeals instructs us that words not statutorily defined should be given their
ordinary meanings, Garcia v. State, 887 S.W.2d 846, 859 (Tex. Crim. App.
1994), cert. denied, 514 U.S. 1005 (1995), the penal code provides that Aunless a different construction [of a statutory term] is required by
the context,@ sections
311.011, 311.012, 311.014-.015, and 311.021-.032 of the government code, known
as the Code Construction Act, apply to the construction of the term.  Tex. Gov=t Code Ann. '' 311.011, .012, .014-.015, .021-.032 (Vernon 2005); Tex. Penal Code Ann. ' 1.05(b).  Government code
section 311.011 provides that A[w]ords and phrases that have acquired a technical or particular
meaning, whether by legislative definition or otherwise, shall be construed
accordingly.@  Tex.
Gov=t Code Ann. ' 311.011.  Moreover, in
determining what definition to apply to the term Adeath@ in this
case, we may look to sources outside the code in which the offense itself is
defined.  See Ex parte Matthews,
892 S.W.2d 208, 210-11 (Tex. App.CHouston [1st Dist.] 1995) (op. on reh=g), aff=d, 933 S.W.2d 134 (Tex. Crim. App 1996), overruled
in part on other grounds by Proctor v. State, 967 S.W.2d 840, 844 (Tex.
Crim. App. 1998).  








Section 671.001 was enacted
to provide guidance to medical professionals and those relying on them in
determining when death occurs.  See
note 16, supra.  Thus, Adeath@ has
acquired a legislatively defined, technical meaning, andCin the context of a homicide prosecution of a medical professional who
has been accused of causing the death of a patient in the course of performing
a medical procedureCwe are
compelled to construe the term Adeath@ in penal
code section 19.01(a) according to this technical definition.  Therefore, we hold that a hypothetically
correct jury charge in this case would have included the definition of death
codified in section 671.001(a) of the Texas Health and Safety Code.  See Gollihar, 46 S.W.3d at 253;
Malik, 953 S.W.2d at 240. 
Accordingly, we will use section 671.001(a)=s cardiopulmonary definition of Adeath@ in
conducting our sufficiency review.  See
Gollihar, 46 S.W.3d at 253; Malik, 953 S.W.2d at 240.[17]

C.  Introduction to Sufficiency Review








In most instances, the death
of an individual is easily determinable, if not obvious.  In this case, however, the issue of when
death occurred is critical to the proper determination of the sufficiency of
the evidence as it relates to causation. 
Accordingly, we set forth the individual testimony of each witness
relevant to the issue of whether McGhee was alive or dead at 21:50 when Grotti
occluded her ET tube and further organize it according to whether the witness
was a fact or expert witness.  








At trial, the State offered
the testimony of numerous JPS employees who were involved to some extent with
the events surrounding McGhee=s treatment in the ER as well as the testimony of two physician
witnesses who offered their expert opinions regarding, among other things,
McGhee=s condition at 21:50.  Grotti
also called a few physician expert witnesses who testified to McGhee=s condition both during and after the code.  As the analysis will show, only one witness,
Dr. Vincent DiMaio, chief medical examiner for San Antonio, testified
unconditionally that McGhee=s respiratory activity after Grotti had called the code at 20:50 was
sufficient to maintain life.  On the
contrary, multiple witnesses attributed McGhee=s post-20:50 respiratory activity to her brain stem, concluding that
her labored respirations were inadequate to maintain her life and that she thus
had experienced irreversible cessation of her spontaneous respiratory and
circulatory functions prior to 21:50, when Grotti occluded her ET tube.  Consequently, we hold that the evidence
showing that McGhee was not alive at 21:50 so greatly outweighs the legally
sufficient evidence supporting the conviction that the jury=s verdict is manifestly unjust. 
See Watson, 2006 WL 2956272, at *8; Johnson, 23 S.W.3d at
11. 

D.  Expert Physician Testimony

1.  Janice Zimmerman, M.D.

Dr.
Zimmerman testified as an expert witness on behalf of the State.  As the director of medicine emergency
services at Ben Taub General Hospital in Houston, Dr. Zimmerman based her
opinions on McGhee=s medical
records, affidavits from JPS employees, information from the Board, and a few
letters, including one from Dr. Cox, one of Grotti=s experts.

Dr. Zimmerman initially
testified that Grotti inappropriately called the code at 20:50 because McGhee
was alive.  Dr. Zimmerman reasoned that
McGhee was alive at 20:34, 20:35, and 20:50 because, according to the code
sheet, she had a pulse.  She also
discussed a blood gas report that was performed at 20:15 which indicated that
McGhee had a low PCO2 number of 23.3 C and a high PO2 number of 354.5 C.[18]  Dr. Zimmerman discussed her understanding of
the meaning of these numbers and testified as follows:








[STATE:] 
Now, in doing a comparison between the PO2 number and the PCO2 number
and in looking at both of those at the same time, can you tell us after
examining those two numbers as to whether or not this woman=s
lungs were functioning correctly?

 

[DR. ZIMMERMAN:] 
Well, what you can say is that she=s able to exchange oxygen and
carbon dioxide - -

 

[STATE:]  Okay.

[DR. ZIMMERMAN:] 
- - across the lungs.  The actual
lung function=s
being done by the mechanical ventilator or by someone squeezing the bag.  This just says she does pretty good at
transferring oxygen from what they=re giving her through her
lungs into her bloodstream and she=s getting rid of carbon
dioxide.  So that transfer of gases is
occurring reasonably well in this lady.

 

Dr. Zimmerman reasoned that
McGhee=s condition did not fit the definition of Adeath@ at
21:50.  She opined that McGhee had blood
circulation and breathed continually between 20:50 and 21:50 and that Grotti=s act of occluding McGhee=s ET tube deprived her of oxygen, thus stopping her breathing.  Dr. Zimmerman testified that McGhee=s respirations between 20:50 and 21:50 were not agonal.  To her, agonal movements and agonal
respirations mean Achest wall
movements.@  She testified to the following:

[STATE:] 
In reviewing everything that you=ve reviewed, what is your
opinion about the respirations that took place between 8:50 and 9:50 p.m.[?]

 

[DR. ZIMMERMAN:] 
Those are what I would call normal - - well, may not be exactly normal,
but the patient was breathing.

 

[STATE:]  Okay.

[DR.
ZIMMERMAN:]  These are not agonal
respirations.








[STATE:]  Why?

[DR.
ZIMMERMAN:]  Agonal respirations are
basically a few breaths that occur when a patient has died.  It just means that part of the brain, we call
a brain stem, just hasn=t quite
died.  So there may be one, two, or three
breaths.  We=re talking minutes at the most, not for an hour.  That is not agonal respirations.

Dr. Zimmerman interpreted the head and neck
movements made by McGhee when Grotti occluded her ET tube as possibly meaning
that McGhee had sensed the lack of oxygen and consequently struggled.  She reasoned that a dead person could not
respond to stimulus like that.  Dr.
Zimmerman also attributed McGhee=s fixed and dilated eyes to the medications previously administered to
her.  

Dr. Zimmerman further opined,
however, that the presence of a pulse is considered to be the return of
spontaneous circulation.  A[A] pulse says there is circulation[,]@ and obtaining a blood pressure is the next step.  She testified that Athere [is] no documentation@ that McGhee had a pulse at 21:50 and that she did not have enough
information to know whether McGhee=s breathing was effective to sustain life at 21:50.  She testified as follows:

[DEFENSE COUNSEL:]  Is it your opinion to a reasonable degree of
medical certainty that at 21[:]50 Lettie McGhee had spontaneous effective
respiratory and circulatory function?

 








[DR. ZIMMERMAN:] 
Again, I can=t
answer that as a yes or no, because I=m making an assumption at
that point.  If she was breathing at
21[:]50 [,] then she did have spontaneous respiratory function and had to have
had some circulatory function to support that.

 

[DEFENSE
COUNSEL:]  Okay.  Now - -

[DR. ZIMMERMAN:] 
Whether it was effective or not, it was effective enough for her to be
breathing.  But I am making the
assumption that she was breathing at that time.

 

[DEFENSE COUNSEL:]  Okay. 
But you - - as I understand it, and correct me if I=m
wrong, what you=re
saying is, you don=t
have enough information to know whether or not it was effective to sustain life
at 21[:]50?

 

[DR. ZIMMERMAN:] 
That would be correct.  At that
point in time I don=t
know that it was effective to sustain her life much beyond that point in
time.  [Emphasis added.]

 

Thus, Dr. Zimmerman admitted that her opinion was
based upon the assumption that McGhee was breathing at 21:50.  Dr. Zimmerman also agreed that a physician
who calls Life Gift would likely have a subjective belief that the patient was
dead.

Dr. Zimmerman disagreed with
a number of conclusions made by Dr. Cox, discussed infra, regarding
McGhee=s condition.  She disagreed with
Dr. Cox=s opinions that McGhee was dead before the code had begun, that
occluding McGhee=s ET tube
after 20:50 would have had no effect on McGhee because she was already dead,
and that Aall
circulation had stopped.@ 

2.  Vincent DiMaio, M.D.








Dr. DiMaio also testified on
behalf of the State as an expert witness. 
As the chief medical examiner for San Antonio, Bexar County, Dr. DiMaio
based his opinions on McGhee=s medical records and the affidavits of various JPS staff.

Dr. DiMaio testified that
McGhee was breathing until the time of the occlusion, that McGhee was alive
when Grotti occluded her ET tube, and that McGhee was dead after Grotti removed
her finger from the end of the ET tube. He thus concluded that McGhee had been
asphyxiated.  Dr. DiMaio testified that
McGhee had sufficient respiratory function at 21:50 to support life and that
the movement of McGhee=s head and
neck during the ET tube=s occlusion
likely indicated that she was struggling in an effort to breathe.  He understood the term agonal respirations to
mean Adifficulty breathing@ and reasoned that a patient experiencing such respirations is still
alive because the patient is breathing. 
He testified that the conscious desire or objective of holding one=s finger over an ET tube for five minutes would be to make absolutely
sure that the person was dead.








Dr. DiMaio also based his
opinion that McGhee was alive at 21:50 on Grotti=s letter to the Board.  As
support for his opinion that McGhee was alive, he cited Grotti=s statements that McGhee had a brady rhythm of thirty to sixty beats
per minute, that McGhee was experiencing agonal respirations, and that McGhee=s head and neck moved when she occluded her ET tube.

3.  Donald McGraw, D.O.

Dr. McGraw
was the ER physician who attended to McGhee until Grotti assumed her care
(shortly before 20:50).  Dr. McGraw
testified that he thought McGhee was going to be transferred to the ICU once
Grotti took over.  Although he described
McGhee=s prognosis from the beginning of the code as Agrim,@ Dr. McGraw
had a Aproblem@ with
calling the code at 20:50 because according to the code sheet, McGhee had a
pulse, a normal sinus rhythm, and a heart rate, conditions that he believes
constitute a Asuccessful@ resuscitation. However, Dr. McGraw was not involved with McGhee=s care anytime after Grotti returned to the ER and assumed McGhee=s care.

4.  James Cox, M.D.

Dr. Cox, an emergency
medicine physician at Harris Methodist Hospital in Fort Worth, testified as an
expert witness on behalf of Grotti.  He
based his opinions on McGhee=s medical records, testimony given by various parties associated with
the case, ACLS guidelines and Aother articles,@ and the
opinions of other experts.








Dr. Cox testified that McGhee
was dead Afor all
practical purposes@ at 19:45,
when she was found in the ER waiting room, and that there was nothing on the
code sheet that suggested to him that she was alive at any point during the
first twenty-seven minutes of the code. 
In discussing the probability of resuscitating a patient over periods of
time and what occurred in this case, Dr. Cox opined that time is a Amajor factor.@  He testified as follows:

[DEFENSE COUNSEL:]  What would the standards of ordinary practice
suggest to you in terms of length in code versus a continuation of the code?

 

[DR. COX:] 
We know that basically every - - every minute you have a ten percent
less chance of survival.  So in ten
minutes if you=re
not resuscitated, [do] not have any responses from somebody, that=s
basically a hundred percent.  In ten
minutes, they=re
gone if you have [not] gotten them back.

 

[DEFENSE COUNSEL:]  What about 20 minutes?

 

[DR. COX:] 
That=s
kind of what we do as a general rule to go 20 minutes to  - - we now say we know ten minutes is it, let=s
give it a double try.  We=ll do
our best, and in 20 minutes if somebody is not showing a response that is
it.  I mean, they=re
not going to be coming back.

 

. . . .

 

[DEFENSE COUNSEL:]  Okay. 
When - - looking at that, can you tell us - - suggest to the jury when
you may have terminated the code had you been administering this code?

 

[DR. COX:] 
Probably about 20[:]08, 20[:]10 is about 20 minutes out, we=re
still not seeing anything going on - -

 

[DEFENSE COUNSEL:]  Okay.

 

[DR. COX:] 
- - positive.

 








Dr. Cox reviewed McGhee=s 20:15 blood gas report.  He
interpreted it as follows:

It tells me they did an excellent job of
ventilating.  They were getting oxygen
into the system and they were hyperoxygenating, the oxygen level was about
three and a half times over what it normally is.  But after all that time they - - we=re
not getting a response.  She was
metabolically acidotic, and what that says is that the cells are dying
inside.  They=re
releasing lactic acid.  They=re -
- it=s all
going down hill.

 

For somebody to be successfully resuscitated you
should be seeing PH - - particularly when you get them early and get intubated
and give them all the drugs, the PH should be holding up there in the pretty
normal range, signs they=re
perfusing and getting circulation.  In
her case you had the oxygen but not the circulation going on so cells are dying
and - - and that=s a
sign that things are not going well and death is occurring.

 

Dr. Cox opined that McGhee
had both respiratory and circulatory failure at 20:15, thirty minutes into the
code.  At 20:16, the code sheet indicates
that McGhee had a palpable pulse and a heart rate of 90.  Dr. Cox testified that McGhee was
nevertheless still not alive.  He
reasoned,

If you have a palpable pulse you have some kind
of pressure, but there=s not
one they could obtain.  You can feel a
pressure that=s
generally at the - - the neck you=ll - - about 50 millimeters
of mercury pressure you will feel it, about temporal arteries it=s
probably going to be 60 or 70 that you can feel.  But that=s not a - - that=s not
a blood pressure you=re
going to have when you=re
alive.  So the heart rate alone, a
palpable pulse without the ability to get a blood pressure is - - it=s a
good thing.  I mean, you like - - that=s at
least something, but it=s not
going to lead to life as such if that=s all it is.  If that=s all you got you=re
still in deep trouble and the patient is not doing well.








Dr. Cox testified that the sinus rhythm that
McGhee exhibited at 20:18 and 20:26, although Agood,@ would not
be sufficient to sustain her life absent a blood pressure, which was
nonexistent according to the code sheet. 
He opined that McGhee experienced major organ failure, which caused her
death, and that she was dead at 20:50, when Grotti called the code.  According to Dr. Cox,

Again, we=ve had no response for - -
forever.  This code has been carried on
three times longer than should be done. 
It=s - -
she=s not
shown any response.  We have yet to have
a blood pressure recorded, even listed no blood pressure.  This is not a patient who is - - is alive.

 

Dr. Cox also discussed brain
stem function and its relation to agonal respirations.  He explained that the brain stem is one of
three major parts of the brain (the other two being the cerebellum and
midbrain), that it is Avery
primitive@ and Atough,@ and that it
controls our breathing, among other things. Dr. Cox testified that the brain
stem may continue to fire after a person has died, thus attempting to cause the
person to breathe, and that, in his experience, it was not uncommon for a
person to have agonal respirations, which he has observed last for an hour,
following the discontinuation of resuscitation. 
He explained that agonal respirations, or Agasping-last type respirations,@ are the result of brain stem activity and are insufficient to
effectively respirate a body because they are not deep respirations.  Dr. Cox stated, 








[W]hen
you=re
breathing in you=ve
got to move in enough air to fill up what we call the dead spaces, the mouth,
the throat, the trachea, the tubes, and finally breathe in enough air to get
the air adequately to the sacks of the lungs where exchange can occur
. . . .  [Agonal respirations] are not going to get air out
to the lungs. 

 

Accordingly, Dr. Cox opined
that McGhee was still dead at 21:50 and that the occlusion of McGhee=s ET tube by Grotti did not cause or contribute to her death.

5.  Gus Krucke, M.D.

Dr. Krucke worked as a
physician in the JPS ICU with Grotti and testified on her behalf as an expert
witness.  Dr. Krucke opined that McGhee=s arrest and death were never successfully reversed and that the code
ought to have been discontinued after the first thirty minutes.  Specifically, he testified that the palpable
pulse and heart rate of 90 indicated at 20:16 on the code sheet does not mean
that McGhee was successfully resuscitated. 
He opined that a sinus rhythm, which McGhee had at a few points during
the code, does not translate to effective coronary perfusion because A[t]here may be electrical activity or automaticity in the heart muscle
itself, but if it=s not
squeezing and it=s not
pumping appropriately then you=re not providing adequate circulation and the rhythm is, therefore,
ineffective.@  Dr. Krucke opined that McGhee was dead at
20:34 and 20:50 and that her chances of successful resuscitation at 20:50 were Azero.@ 








Dr. Krucke testified that the
fact that condensation was observed in McGhee=s ET tube after the code was called would neither surprise him nor
change his opinion that she was dead by 20:50. 
He testified that he had observed Athousands@ of people
die over the course of his career and that it was not uncommon for a person to
have what appears to be respiration thereafter. 
According to Dr. Krucke,

It is not unusual in the death process to have
two situations.  One is, let=s
say, where you are withdrawing life support in a patient who still has a blood
pressure and a pulse.  The family=s
elected based on the patient=s previously expressed wishes
to have artificial life support measures removed and the tube is removed, and
then, yes, there is respiration that eventually diminishes over time to no
movement or respiration at all.

 

And then there=s the other case of an
individual who has already been declared dead who might have spinal reflexes
anywhere from 30 minutes, 60 minutes, an hour and a half after the declared
death but that doesn=t
constitute respiration.

 

He opined that McGhee was experiencing Aspinal reflexes,@ not agonal
respirations, when Grotti occluded her ET tube. 
He testified that although there is no medical reason to occlude an ET
tube, Grotti=s occlusion
of McGhee=s ET tube
had no effect on McGhee. 

6.  Grotti








Much of the relevant portions
of Grotti=s testimony
has already been detailed in the factual background section above.  She testified that McGhee was never
successfully revived or resuscitated at any point during the code.  Grotti testified that she had never called a
code when a patient had a pulse and that she called McGhee=s code at 20:50 because McGhee had lost a pulse, had no spontaneous
respiration, and had no blood pressure; McGhee was dead.  She did not indicate on the code sheet at
20:51 that McGhee did not have a pulse because she never thought that anyone
would assume that she called the code when a pulse was present.  She testified that McGhee=s respiratory efforts were ineffectively depositing air into her lungs
after the code had been called and that she explained to Nurse Martin, who had
informed her that she thought McGhee was breathing, that McGhee was
cardiopulmonarily dead and was experiencing agonal respirations.  She described agonal respirations as the
brain stem firing, thus causing muscle contractions in an effort to try to make
the body breathe again.  Grotti
accordingly attributed the source of McGhee=s respiratory efforts to McGhee=s brain stem.  She testified as
follows:

Okay. 
Well, when the brain stem fires it actually causes muscle contractions
to try to restart the breathing - - you know, the breathing action.  It tries to - - it causes muscle contractions
in the throat, in the diaphragm, and it tries to open up the airways so it
tries to extend the neck.  So what is
actually happening was the brain stem is firing, she=s
getting muscle contractions, it=s opening up her airway and
causing enough negative pressure to have some air move.

 








Grotti testified that she thought occluding
McGhee=s ET tube would be the equivalent of removing it because McGhee=s airway would close or collapse upon the ET tube=s removal.  She did not hear any
heart sounds, and she did not detect a palpable pulse after 20:50.  She thus occluded McGhee=s ET tube to stop the agonal respirations.  McGhee was already dead and had no
cardiopulmonary function at that time, according to Grotti.

E.  Eyewitness Testimony

1.  EMT Leigh Taylor

Taylor was approached by
McGhee=s daughter in the ER and was the first to assess McGhee.  She assisted in the code until Grotti
initially assessed McGhee and returned to the ICU.  Dr. McGraw sent Taylor to the pharmacy at
that point to retrieve medications.  When
Taylor returned to the ER, the code had been called, McGhee had been
disconnected from the ventilator, and the nurses were Avery upset.@








One of Taylor=s responsibilities was to Aprep@ McGhee so
that her body could be viewed by family members before being transported to the
medical examiner=s
office.  Taylor attempted to prep McGhee Aabout 30 minutes@ after she
had returned to the ER from the pharmacy with the medications but was unable to
because McGhee had a Arhythm on
the monitor,@ her chest
was Arising and falling,@ and she Aappeared to
be breathing.@  Taylor also observed condensation in McGhee=s ET tube, which she associated with breathing. According to Taylor, A[t]he condensation - - I could see moisture coming through the tube
every time she would breathe - - like she=d breathe in and out, her chest would rise and fall.@  Taylor testified that she
observed this activity for fifteen to twenty minutes on three different
occasions and that McGhee=s Aair exchange@ became
slower and slower with each visit.  She
associated the term Aagonal
respiration@ with slow,
difficult breathing, but she could not say that McGhee ever had a pulse after
Grotti pronounced her dead at 20:50.

2.  Nurse Jennifer Lovins

Nurse Lovins participated in
the entire code and entered the information on the code sheet until 20:34.  She testified that McGhee had a palpable
pulse at some point during the first twenty-seven minutes of the code but that
she did not record it on the code sheet. 
She testified that she was Ashocked and upset@ when Grotti called the code and disconnected the ventilator because
she did not think that McGhee was dead. 
Nurse Lovins thought that McGhee was Abreathing@ because
McGhee=s chest was rising and falling and because there was condensation in
the ET tube.  She questioned Dr. Eli if
McGhee=s Arespirations@ were a normal occurrence for someone who had just been taken off of a
ventilator; he responded that he had never experienced it before.








Nurse Lovins opined that
McGhee was alive.  She said that she was Ain and out@ of the room
a few times after Grotti called the code and that she observed McGhee=s respirations Afor at least
30 minutes@
thereafter.  She described McGhee=s respirations as Aregular@ during this
period because they were occurring at Aregular intervals@ and Awere not
labored.@  Nurse Lovins never palpated
for a pulse after 20:50.

3.  Nurse Paula Martin








Nurse Martin participated in
McGhee=s resuscitation effort too.  At
some point during the code, after Grotti=s first visit to the ER, Dr. McGraw asked Nurse Martin to retrieve
some Levophed, a drug used to raise blood pressure, because the code team had
administered the maximum amount of dopamine, another blood pressure medication.  When Nurse Martin returned to the trauma
room, Grotti, who was standing at the head of McGhee=s bed, told Nurse Martin that she did not want to use the
Levophed.  The ventilator had been turned
off, and Nurse Martin assumed that Grotti had removed McGhee from the
ventilator to determine whether she would take any spontaneous breaths.  After McGhee had been off of the ventilator
for a brief period, Nurse Martin asked Grotti if she planned to reconnect the
ventilator.  Grotti responded, ANo, the patient=s
respirations are agonal.@  Nurse Martin, however, recounted that McGhee
was Abreathing@ and that
her breaths were Aregular@ (ten breaths per minute), Aforceful,@ Adeep,@ and had Aenough force to cause condensation to come halfway up the end of the
endotracheal tube.@  McGhee=s respirations became less and less Aforceful,@ however,
after she was removed from the ventilator. 
Nurse Martin further testified that after Grotti had pronounced McGhee
dead and during McGhee=s Aregular@ breathing,
someone in the room, though she could not remember who, stated that McGhee had
a pulse.  Nurse Martin did not check
McGhee for a pulse.

4.  EMT Kimberly Short

Short participated in the code,
primarily assisting Taylor with chest compressions.  Short testified that as Grotti took McGhee
off the ventilator at the conclusion of the code, Grotti stated that she Awas going to have to do it in the morning anyway@ and that she Awould take
full responsibility.@  Short observed McGhee Abreathing@ immediately
after the code was called.  She
testified, 

Ms. McGhee had an endotracheal tube, which is the
tube that you put in their throat to maintain their airway and to provide
oxygen to the lungs, and you can see the secretions through the ET tube as she
was breathing.  She had - - her chest
would rise and fall in a normal pattern. 
It didn=t
look like she was, you know, struggling for air.

 








Short testified that she observed this activity
for just over an hour after Grotti called the code.  She ultimately prepared McGhee=s body for viewing, though she could not recall exactly when, and she
testified that she felt a palpable pulse in two different locations, but she
could not recall whether it was Afaint@ or Apounding.@  Short claimed to have told a nurse about the
pulse, but she did not inform Grotti.

5.  R.N./ER Manager Synthia Chandler  








Nurse Chandler served as a
joint manager of the ER at the time of the incident.  She is a registered nurse who at the time of
trial had worked at JPS for twenty-five years, twenty-two of them in the
ER.  She did not participate in the code,
but she and her Awork
partner,@ Don Baylor, spoke with Grotti the following morning, December 27,
2000, about Grotti=s act of
occluding McGhee=s ET
tube.  During their conversation, Grotti
was adamant that McGhee was dead when she occluded McGhee=s ET tube, answering, AShe was dead,@ to many of
Baylor=s questions.  Nurse Chandler
testified that agonal respirations are Asometimes@ not
effective respiration, that she has observed a body continue to have Areflexive action@ as part of
a process of death following the calling of a code, which can sometimes be
caused by hyperoxygenation, and that McGhee had been hyperoxygenated.  Nurse Chandler agreed that the brain stem is
one of the last body functions to die off, that electrical activity may
continue on the cardiac monitor after death, and that a person may occasionally
have an exchange of oxygen that appears to be respiration after death.

6.  Nurse Christi Berglund

Nurse Berglund was the charge
nurse/team leader in the ER on December 26, 2000.  Although she personally participated in
McGhee=s code only briefly, she was kept apprised of the staff=s resuscitation effort as it progressed.  After the code had been called, she
observed Grotti standing at the head of McGhee=s bed, occluding her ET tube. 
Nurse Berglund asked Grotti what she was doing and why.  Grotti responded that she was unable to
remove the ET tube because McGhee was going to be an AME case@ and that
she did not want McGhee=s family to
be upset by the agonal movements that McGhee was exhibiting.  Nurse Berglund opined that Grotti=s occlusion of McGhee=s ET tube Awas not
going to make a difference as to whether or not [McGhee] lived or died.@  She testified that she has Aacknowledged in the past@ that she observed McGhee making Achest movements@ but that
they were not effective to exchange air. 
Nurse Berglund testified as follows:

[DEFENSE COUNSEL:]  Could you tell me kind of - - or tell us, not
just me, but kind of what you saw when you say that you saw chest movements
after the code was called?

 

[NURSE BERGLUND:] 
It was just chest movements.  It
looked like she was trying to breathe but she just wasn=t
getting full chest or lung expansion. [RR6: 205]








[DEFENSE COUNSEL:]  And you also are in the position, are you
not, that after the code was pronounced - - called and - - and Ms. McGhee was
pronounced deceased, her chest wasn=t rising and falling normally
like someone=s
chest rises and falls when they are breathing; is that a correct - -

 

[NURSE BERGLUND:] 
No.

 

[DEFENSE COUNSEL:]  Is that a correct statement?

 

[NURSE BERGLUND:] 
Oh, yes.  I=m
sorry.

 

. . . .

 

[DEFENSE COUNSEL:]  Based on your experience of having been a
nurse for all the years that you=ve been a nurse and being around
and observing, it=s
your position, is it not, that other observers could see the activity that you
saw that you say had any - - could have the appearance of breathing and
misinterpret it as actually being breathing?

 

[NURSE BERGLUND:] 
Yes.

 

Nurse Berglund described the movements that she
observed McGhee making as agonal or brain stem reflexes.  She testified that if McGhee was not dead
when Grotti called the code, she Acertainly would have been dead 25 minutes later,@ the point at which she believed Grotti had occluded McGhee=s ET tube. 

 

 

 

 








7.  Respiratory Therapist Dennis Hunt

Hunt was the respiratory
therapist assigned to the JPS ER on December 26, 2000.[19]  He performed CPR on McGhee during the initial
stages of the code and placed her on a ventilator at approximately 20:20.  Hunt observed McGhee thereafter for five to
fifteen minutes before leaving the trauma room to attend to other patients in
the ER.  He did not observe McGhee take
any spontaneous breaths during this period. 
Hunt returned to the trauma room where McGhee was located when he heard
the ventilator alarm sounding.  Grotti
had disconnected the ventilator.  Hunt
testified that he Adidn=t notice anything out of the normal@ in terms of the nurses= behavior at that point, that no one objected out loud to Grotti=s actions, and that no one instructed him to reconnect the
ventilator.  As the respiratory therapist
on call in the ER, Hunt testified that he would have brought it to someone=s attention if he had observed McGhee attempting to breathe after the
code had been called.

8.  Michael Kasschau, M.D.








Dr. Kasschau, a resident
assigned to the ICU, arrived at JPS at 21:45 on December 26, 2000 and checked
in with Grotti, who was in the ER trauma room with McGhee, at approximately
21:55.  Dr. Kasschau returned to the
trauma room to visit with Grotti at about 22:05.[20]  Standing fifteen feet away from Grotti, he
spoke with her for about five to ten minutes but was unable to see what she was
doing.  Dr. Kasschau then moved up to
McGhee=s bedside and saw Grotti occluding McGhee=s ET tube with her thumb for five minutes. Dr. Kasschau observed
occasional activity on the cardiac monitor as he spoke to Grotti.  He agreed that A[i]t just means that there=s still electrical activity in the heart that is observable by the
machine,@ not that there is a pulse or a perfusing heart.  He had the impression at that point that
McGhee had expired and that Grotti was not killing her. 

F.  Sufficiency Holdings








Viewing the
evidence in the light most favorable to the verdict and giving full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts, we hold that a rational trier of fact could have found, based
primarily on Dr. DiMaio=s testimony,
that McGhee was alive at 21:50, when Grotti occluded her ET tube.  See Jackson, 443 U.S. at 319, 99 S.
Ct. at 2789; Hampton, 165 S.W.3d at 693. 
The evidence is thus legally sufficient to show that McGhee was
an Aindividual@ within the
meaning of sections 1.07(a)(26) and 19.01(a) of the penal code.  Tex.
Penal Code Ann. ''
1.07(a)(26), 19.01(a).

But viewing all the evidence
in a neutral light, favoring neither party, and considering evidence that both
supports and contradicts the verdict, we hold that the evidence is factually
insufficient to show that McGhee was alive at 21:50.  See Watson, 2006 WL 2956272, at *8,
10.  Viewed objectively, the great weight
and preponderance of all the evidence contradicts the verdict.  See id. at *10.








We are required to perform a
number of tasks upon determining that the evidence is factually insufficient to
support the jury=s
verdict.  See Goodman, 66 S.W.3d
at 295-96 (Keller, J., concurring).  We
must detail the evidenceCall of the
evidenceCrelevant to the evidentiary sufficiency issue.  We have done so above.  We are also required to state clearly why the
jury=s finding is factually insufficient. 
Id. at 287.  Here, the
evidence that McGhee was alive at 21:50 is factually insufficient under the
second ground articulated by the court of criminal appeals: there is evidence
both supporting and contradicting the verdict, and weighing all of the
evidence, we have determined that the contrary evidence claiming that McGhee
was not alive at 21:50 so greatly outweighs the legally sufficient evidence
supporting the conviction that the jury=s verdict is manifestly unjust. 
See Watson, 2006 WL 2956272, at *8, 10.  Finally, we are required to explain why the
evidence that McGhee was not alive at 21:50 outweighed the evidence that McGhee
was alive at 21:50.  We do so below.

EMT Taylor, Nurse Lovins,
Nurse Martin, EMT Short, Nurse Berglund, Dr. McGraw, and Grotti all had
participated in McGhee=s treatment
in some manner before 21:50, when Grotti occluded the ET tube.  All but McGraw testified that McGhee made
respiratory efforts after 20:50, when Grotti called the code.  But neither Taylor, Nurse Lovins, nor Nurse
Martin testified that the activity occurred anytime beyond thirty minutes from
the point at which Grotti called the code, and none of them checked for a pulse
after 20:50.  Short was the only witness
who testified that she felt pulse after 20:50. 
She was not able, however, to testify to what time she felt the pulses
after 20:50.  Moreover, although the
collective testimony of Taylor, Nurse Lovins, Nurse Martin, and Short shows
that McGhee was making respiratory effort after Grotti called the code, there
was no testimony from any of these witnesses that that effort was effective to
maintain life or adequately exchange air.








Although Dr. Zimmerman
testified that McGhee=s condition
did not fit the definition of death at 21:50, she also testified that a pulse
is indicative of circulation and admitted that there was no documentation that
McGhee had a pulse at 21:50.  She further
testified that she was assuming that McGhee was breathing and that she
did not have enough information to know whether McGhee=s breathing was effective to sustain her life at 21:50.  In other words, she was unable to provide
critical expert testimony regarding the fundamental issue in this case:  Was McGhee=s death due to irreversible cessation of her respiratory and
circulatory functions at the time that Grotti occluded the ET tube?  Her testimony therefore lacks probative
weight.  

Conversely, Nurse Berglund
and Grotti testified that McGhee=s respiratory efforts were ineffective to adequately exchange air and
that she was dead before 21:50.  Both
described McGhee=s movements
as agonal-type reflexes, and Nurse Berglund explained that others could
misinterpret McGhee=s
respiratory efforts as breathing.








Further, Dr. Cox testified
extensively on the issues of life and death and opined that McGhee was dead at
19:45, 20:50, and 21:50, that McGhee=s blood gas report indicated that her death was Aoccurring,@ and that
McGhee had respiratory and circulatory failure at 20:15, nearly thirty-five
minutes before Grotti called the code. 
Significantly, as Dr. Cox further pointed out, McGhee never had a blood
pressure, according to the code sheet, despite being coded for over sixty
minutes and being shocked fifteen times. 
Dr. Krucke also opined that McGhee=s arrest and death, which he said occurred at 19:45, were never successfully
reversed and that it was not uncommon for deceased individuals to experience
spinal reflexes after death.








Dr. DiMaio was the only
expert witness who unconditionally opined that McGhee was still alive at
21:50.  But the overwhelming weight of
the testimony regarding McGhee=s respirations between 20:50 and 21:50, particularly the testimony of
Dr. Cox, Dr. Krucke, Nurse Berglund, and Grotti, was that McGhee=s respirations were ineffective to adequately exchange air.  While Dr. Zimmerman opined that the
respirations were not agonal, but instead Anot normal@ breaths,
Dr. DiMaio reasoned that they were agonal breaths which, according to him,
meant only Adifficulty
breathing.@  On the other hand, Dr. Cox, Dr. Krucke,
Grotti, and Nurse Berglund attributed McGhee=s post-20:50 respiratory efforts to her brain stem, which was firing
in an attempt to restart her breathing process. 
These witnesses all agreed that this agonal breathing was insufficient
to maintain life.  And although she did
not testify that McGhee was alive or dead at 21:50, Nurse Chandler explained
that she has observed a body continue to have Areflexive action@ as part of
the process of death after a code has been called, which can sometimes be
caused by hyperoxygenation, and that McGhee had been hyperoxygenated.  Further support for the conclusions reached
by Dr. Cox, Dr. Krucke, Grotti, Nurse Berglund, and Nurse Chandler is evidenced
in McGhee=s 20:15
blood gas report, which indicated that McGhee=s PH level was below normal and that she was metabolically
acidotic.  This meant that although
McGhee was hyperoxygenated,  her
circulatory function was failing, which caused the cells to release lactic acid
because they were not receiving adequate oxygen.

There is no evidence that
McGhee had a pulse at 21:50.  The extent
of the medications and defibrillations administered to McGhee, the length of
the code itself, and the time at which Grotti occluded McGhee=s ET tube vis-a-vis the time that she was found and the time
that the code was called further support the conclusion that McGhee was dead at
21:50.  Consequently, numerous witnesses
thus reasoned that McGhee had met the definition of deathCas found in section 671.001(a) of the Texas Health and Safety CodeCbefore 21:50.








Accordingly, the evidence
that McGhee was not alive at 21:50 so greatly outweighed the evidence that
McGhee was alive at 21:50 that the jury=s verdict was manifestly unjust because (1) the evidence contrary to
the verdict demonstrates that McGhee experienced irreversible cessation of her
spontaneous respiratory and circulatory functions prior to 21:50 and (2) her
respiratory efforts between 20:50 and 21:50 were insufficient to maintain
life.  See Tex. Health & Safety Code Ann. ' 671.001(a).  Although there is
legally sufficient evidence supporting the jury=s verdict, which primarily consists of Dr. DiMaio=s testimony, after viewing all of the evidence in a neutral light, and
exercising our exclusive jurisdiction to determine this factual sufficiency
issue, we must conclude that the evidence supporting the verdict is so
outweighed by the contrary evidence that the jury=s verdict was manifestly unjust.[21]








Because we hold that the
evidence is factually insufficient to demonstrate that McGhee was alive at
21:50Cbecause the contrary evidence is so strongCthe evidence is therefore also factually insufficient to show that
McGhee was an Aindividual@ within the meaning of sections 1.07(a)(26) and 19.01(a) of the penal
code.  Tex.
Penal Code Ann. ''
1.07(a)(26), 19.01(a).  Consequently, the
evidence is factually insufficient to show that Grotti=s act of occluding McGhee=s ET tube caused McGhee=s death.  We sustain Grotti=s first issue.








In her second issue, Grotti
argues that the evidence is factually insufficient to show that she caused
McGhee=s death.  She argues that it was
McGhee=s disease process that caused McGhee=s death, not her act of occluding McGhee=s ET tube.  Grotti=s argument is in the form of a factual sufficiency challenge and, if
sustained, would not entitle her to any greater relief than that available to
her pursuant to our factual insufficiency holding above.  Moreover, her argument is based upon the
presumption that McGhee was alive when Grotti occluded her ET tube.  We have already determined that the evidence
is factually insufficient to show that McGhee was alive when Grotti occluded
her ET tube and, consequently, that Grotti did not cause her death.  Therefore, any inquiry into the cause of
McGhee=s death based upon an underlying presumption that McGhee was alive
would be unnecessary and moot.  For these
reasons, we need not address this issue. 
See Tex. R. App. P.
47.1.

Because Grotti=s remaining issues, if sustained, would entitle her to greater relief
than that afforded to her pursuant to our factual insufficiency holding, we
address them below.

IV. 
Gross Deviation & Lesser Included Offense

In her third
issue, Grotti argues that there was no evidence that she committed a gross
deviation from a standard of care.  See
Tex. Penal Code Ann. ' 6.03(d) (Vernon 2003).  She
argues that no expert testified that her conduct constituted a gross deviation
from a standard of care and that a lay juror could not make such a
determination on the basis of mere conjecture or speculation. We also consider
Grotti=s fourth issue here, in which she argues that the trial court erred by
instructing the jury on the lesser included offense of criminally negligent
homicide.  She argues that her act of
occluding McGhee=s ET tube
was intentional, not negligent, and that she is guilty of either a different
degree of homicide or none at all.








We use a two-pronged test to
determine whether a defendant is entitled to an instruction on a lesser
included offense.  Rousseau v. State,
855 S.W.2d 666, 672-73 (Tex. Crim. App.), cert. denied, 510 U.S. 919
(1993); Royster v. State, 622 S.W.2d 442, 446 (Tex. Crim. App. [Panel
Op.] 1981) (op. on reh=g).  First, the lesser included offense must be
included within the proof necessary to establish the offense charged.  Salinas v. State, 163 S.W.3d 734, 741
(Tex. Crim. App. 2005).  This means that
the offense must comport with article 37.09 of the Texas Code of Criminal
Procedure.  Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon 1981); Moore
v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). 

Second, some evidence must
exist in the record that would permit a jury to rationally find that if
appellant is guilty, he is guilty only of the lesser offense.  Salinas, 163 S.W.3d at 741; Rousseau,
855 S.W.2d at 672-73; Royster, 622 S.W.2d at 446.  The evidence must be evaluated in the context
of the entire record.  Moore, 969
S.W.2d at 8.  There must be some evidence
from which a rational jury could acquit the defendant of the greater offense
while convicting him of the lesser included offense.  Id. 
The court may not consider whether the evidence is credible,
controverted, or in conflict with other evidence.  Id. 
If there is evidence from any source that negates or refutes the element
establishing the greater offense, or if the evidence is so weak that it is
subject to more than one reasonable inference regarding the aggravating
element, the jury should be charged on the lesser included offense.  See Schweinle v. State, 915 S.W.2d 17,
19 (Tex. Crim. App. 1996); Saunders v. State, 840 S.W.2d 390, 391-92
(Tex. Crim. App. 1992).








A person commits criminally
negligent homicide if she causes the death of another by criminal
negligence.  Tex. Penal Code Ann. ' 19.05(a).  Criminal negligence
occurs when the person ought to be aware of a substantial and unjustifiable
risk that the circumstances exist or the result will occur.  Id. ' 6.03(d).  The risk must be of
such a nature and degree that the failure to perceive it constitutes a gross
deviation from the standard of care that an ordinary person would exercise
under all the circumstances as viewed from the actor=s standpoint.  Id.  It is the Afailure to perceive@ the risk that must rise to the level of a Agross deviation@ from an
ordinary standard of care.  Graham v.
State, 657 S.W.2d 99, 101 (Tex. Crim. App. 1983).








The offense of criminally
negligent homicide Ainvolves
inattentive risk creation, that is, the actor ought to be aware of the risk
surrounding his conduct or the results thereof [but fails] to perceive the
risk.@  Stadt v. State, 182
S.W.3d 360, 364 (Tex. Crim. App. 2006) (quoting Lewis v. State, 529
S.W.2d 550, 553 (Tex. Crim. App. 1975)). 
For a defendant to be entitled to a jury charge on criminally negligent
homicide, the record must contain some evidence that the defendant did not
intend the resulting death or know that it was reasonably certain to
occur.  Ybarra v. State, 890
S.W.2d 98, 110 (Tex. App.CSan Antonio
1994, pet. ref=d).  If such evidence is present, before a charge
on criminally negligent homicide is required, the record must also contain
evidence showing an unawareness of the risk.  Mendieta v. State, 706 S.W.2d 651, 653
(Tex. Crim. App. 1986); Licon v. State, 99 S.W.3d 918, 928 (Tex. App.CEl Paso 2003, no pet.); Ybarra, 890 S.W.2d at 110.

Criminally negligent homicide
is a lesser included offense of murder.  See
Lugo v. State, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984).  Thus, the first prong under Royster is
met.  The issue here is whether there is
some evidence in the record that would permit a jury to rationally find that if
Grotti is guilty, she is guilty only of the lesser included offense of
criminally negligent homicide.

Grotti testified that McGhee
was never successfully revived or resuscitated at any point during the code,
that she called the code because McGhee was dead, and that McGhee=s post-20:50 respiratory efforts were merely agonal respirations.  Grotti also testified that she did not harm
McGhee when she occluded McGhee=s ET tube and that she did not occlude the ET tube in order to kill
McGhee.  The record thus contains some
evidence that Grotti neither intended to cause McGhee=s death nor did she know that it was reasonably certain to occur.  








The obvious risk associated
with occluding McGhee=s ET tube is
Grotti=s failure to recognize that McGhee could possibly have been alive and
that her occlusion of McGhee=s ET tube could cause McGhee to asphyxiate.  As set forth in our evidentiary sufficiency
analysis above, there is evidence, primarily from Dr. DiMaio and Dr. Zimmerman,
that McGhee=s respiratory
efforts were not agonal and that she was alive when Grotti occluded her ET
tube, although Zimmerman Aassumed@ that McGhee was breathing. 
Considered along with Grotti=s opinion of McGhee=s condition at 21:50, this is some evidence indicating an unawareness
by Grotti that McGhee could possibly have been alive at 21:50.  See Mendieta, 706 S.W.2d at 653; Ybarra,
890 S.W.2d at 110.  There is thus some
evidence in the record that would permit a jury to rationally find that Grotti
is guilty only of the lesser included offense of criminally negligent homicide.  See Royster, 622 S.W.2d at 446.    








Regarding Grotti=s gross deviation argument, the record demonstrates that Grotti was
board certified in internal medicine and critical care and had years of
emergency care experience.  Dr. Zimmerman
testified that she could think of no Amedical or commonsensical@ justification for ever occluding a patient=s ET tube, and Grotti herself said that occlusion of McGhee=s ET tube would have been Ahorrible,@ Aextreme,@ and a Adisregard[] to the normal standard of medical practice@ if McGhee had been alive at the time. 
Notwithstanding our factual sufficiency holding above, this evidence,
considered with Dr. DiMaio=s opinion about McGhee=s condition at 21:50 (i.e., that she was breathing), constitutes some
evidence that Grotti=s failure to
perceive that McGhee was possibly alive was a gross deviation from an ordinary
standard of care.[22]  Accordingly, we overrule Grotti=s third and fourth issues.

V.  Prosecutorial MisconductCMotion for Mistrial

In her fifth issue, Grotti
argues that the State deliberately violated an in limine order by asking
a question that allegedly implicated Abad acts@ evidence.
She argues that the alleged violation constituted prejudicial prosecutorial
misconduct and that the trial court erred by denying her motion for mistrial.








A mistrial is an extreme
remedy for prejudicial events occurring during the trial process.  Bauder v. State, 921 S.W.2d 696, 698
(Tex. Crim. App. 1996).  It is a device
used to halt trial proceedings when error is so prejudicial that expenditure of
further time and expense would be wasteful and futile.  Ladd v. State, 3 S.W.3d 547, 567 (Tex.
Crim. App. 1999), cert. denied, 529 U.S. 1070 (2000).  The asking of an improper question will
seldom require a mistrial because, in most cases, any harm can be cured by an
instruction to disregard.  Id.; Hernandez
v. State, 805 S.W.2d 409, 413-14 (Tex. Crim. App. 1990), cert. denied,
500 U.S. 960 (1991).  But a mistrial is
required when an improper question or reference is clearly prejudicial to the
defendant and is of such character as to suggest the impossibility of
withdrawing the impression produced on the minds of the jurors.  Simpson v. State, 119 S.W.3d 262, 272
(Tex. Crim. App. 2003), cert. denied, 542 U.S. 905 (2004); Ladd,
3 S.W.3d at 567.  Only when it is
apparent that an objectionable event at trial is so emotionally inflammatory
that curative instructions are not likely to prevent the jury from being
unfairly prejudiced against the defendant is a trial court required to grant a
mistrial.  Bauder, 921 S.W.2d at
698.    








The denial of a motion for
mistrial is reviewed under an abuse of discretion standard.  Ladd, 3 S.W.3d at 567.  The determination of whether a given error
necessitates a mistrial must be made by examining the particular facts of the
case.  Id.  To preserve error involving prosecutorial
misconduct, the defendant must (1) make a timely and specific objection, (2)
request an instruction that the jury disregard, and (3) move for a
mistrial.  Penry v. State, 903
S.W.2d 715, 764 (Tex. Crim. App.), cert. denied, 516 U.S. 977 (1995); Cook
v. State, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993).

The following exchange took
place during the State=s
cross-examination of Grotti:

[STATE:] 
When you pull out a patient=s endotracheal tube

 . . .

 

[GROTTI:]  Right.

[STATE:] 
Does their airway - - in somebody that is dying, does their airway
collapse upon itself like you claim?

 

[GROTTI:] 
That depends on the situation.  In
this patient, she was completely [flaccid], her muscles had absolutely no
tone.  So the - - what would happen if
the tube was pulled out is all of her tissues would have collapsed inward.

 

[STATE:]  Did Woody O=Keefe=s airway
collapse?

[DEFENSE COUNSEL:]  Objection, Judge.  Can we approach the bench?  I=d [like] to make a motion for
mistrial at this time.

 








The judge then excused the jury from the
courtroom and allowed the prosecutor to question Grotti about O=Keefe, a patient who allegedly died of acute morphine intoxication
while under Grotti=s care in
April 2001.  After the State had asked a
few questions, the judge interrupted and asked, AWho is Woody O=Keefe?@  With the judge=s recommendation, the attorneys for both sides later agreed to excuse
the jury for the remainder of the day. 
But before dismissing the jurors, the trial court instructed them as
follows:

THE COURT: 
Now I will tell you this: Right before you went into the jury room,
there was a question about referring to a Woody O=Keefe=s
airway.  You will disregard for all
purposes that question or any reference to a person named Woody O=Keefe,
whoever that may be.  Does everyone understand
that instruction?

 

SEVERAL JURY
MEMBERS:  Yes.

THE COURT: 
All right.  Disregard doesn=t
mean that you didn=t
hear it, you did.  Disregard means that
has nothing to do with anything going on in this trial.  I won=t even think about it or
consider it for any purpose, whatsoever, just like I won=t
consider whether the Rangers won or lost last night because it has nothing to
do with this trial.  Does everyone
understand what disregard means?

 

SEVERAL JURY
MEMBERS:  Yes.

THE COURT: 
Can everyone follow the Court=s instruction to disregard
that statement or remark?

 

SEVERAL JURY
MEMBERS:  Yes.

THE COURT: 
Is there anyone who cannot, if so, just raise your hands.  I see no hands.  I thank you for that and following the law
and the rules and your instructions.

 

The trial court ultimately sustained Grotti=s objection but denied her motion for mistrial.








The State initially argues
that Grotti failed to preserve error because her attorney did not specifically
object to the complained-of question.  We
disagree. After the trial court allowed the prosecutor to question Grotti about
O=Keefe, it allowed Grotti=s attorney to thoroughly explain the basis of the objection and
argument.  The basis of the objection is
thus apparent from the record even though Grotti=s counsel merely asserted a general objection when the prosecutor
first asked the question.

Turning to the merits of
Grotti=s argument, the record does not demonstrate that the question posed by
the prosecutor was Aclearly
prejudicial@ to Grotti
or was Aso emotionally inflammatory@ that the trial court=s subsequent instruction to disregard failed to cure its prejudicial
effect, if any.  See Simpson, 119
S.W.3d at 272; Bauder, 921 S.W.2d at 698.  Grotti did not have an opportunity to respond
to the question, her counsel objected immediately, and no further questions
concerning O=Keefe were
asked in the presence of the jury.  The
trial court did not even know (or had to be reminded) who O=Keefe was.  The severity of the
conduct, if any, was thus minimal.  








In addition to  instructing the jury to disregard the
question, the trial court gave the jury an opportunity to inform it if they
could not follow the instruction; no one expressed an inability to follow the
instruction.  Grotti has presented no
evidence to rebut the presumption that the jury followed the court=s instruction to disregard.  See
Michaelwicz v. State, 186 S.W.3d 601, 620 (Tex. App.CAustin 2006, pet. ref=d) (AThe jury is
presumed to follow the trial court=s instruction to disregard unless the comment is so prejudicial or
extreme that the instruction was incapable of removing the harm.@).  We hold that the trial court=s instruction to disregard was effective and cured the prejudicial
effect, if any, stemming from the prosecutor=s question.  Accordingly, the
trial court did not abuse its discretion by denying Grotti=s motion for mistrial.  We
overrule Grotti=s fifth
issue.

VI.  Expert Opinions








In her sixth issue, Grotti
argues that the opinions of the State=s experts were based on conjecture, not fact.  She argues that there is no evidence that
from 20:50 to 21:50 McGhee had the spontaneous ability to maintain an adequate
exchange of oxygen and carbon dioxide in her lungs and that there is no
evidence that McGhee=s heart was
able to spontaneously circulate or perfuse oxygen-carrying blood to the organs
of her body.  She contends that, to the
contrary, there was an abundance of evidence that McGhee lacked efficient
spontaneous coronary perfusion and exchange of oxygen and carbon dioxide in her
lungs.  AFor that reason,@ Grotti
argues, Aany opinion that Ms. McGhee was alive at 21:50 or that Dr. Grotti
caused her death at 21:50 would have been the result of rank conjecture and
speculation.@  Grotti=s argument thus amounts to this: Because the evidence is insufficient
to show that McGhee was alive at 21:50, Dr. Zimmerman=s opinions regarding McGhee=s condition at the same time were based on conjecture.  We disagree.

A witness qualified as an
expert may testify in the form of an opinion if scientific, technical, or other
specialized knowledge will assist the trier of fact to understand the evidence
or to determine a fact in issue.  Tex. R. Evid. 702.  Expert witness testimony should be admitted
only when it is helpful to the jury and limited to situations in which the
expert=s knowledge and experience on a relevant issue are beyond that of an
average juror.  Williams v. State,
895 S.W.2d 363, 366 (Tex. Crim. App. 1994). 
An expert=s opinion
must be more than Asubjective
belief or unsupported speculation,@ but it need not reach the level of Aknown to a certainty@ to be admissible.  Daubert
v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590, 113 S. Ct. 2786, 2795
(1993).  Testimony in the form of an
opinion or inference otherwise admissible is not objectionable because it
embraces an ultimate issue to be decided by the trier of fact.  Tex.
R. Evid. 704.








The admissibility of evidence
is within the discretion of the trial court, 
and the trial court=s ruling will not be reversed absent an abuse of discretion.  Osbourn v. State, 92 S.W.3d 531, 537
(Tex. Crim. App. 2002).  If there is
evidence supporting the trial court=s decision to admit evidence, there is no abuse of discretion.  Id. at 538. 

We initially note that
although Grotti challenges the opinions of all of the experts who testified on
behalf of the State, her brief addresses only the testimony of Dr. Zimmerman
and not those of any other experts. 
Because she does not assert any argument or authority regarding the
other State=s experts,
she has forfeited that portion of her argument by inadequate briefing.  See Tex.
R. App. P. 38.1(h) (requiring brief to contain a clear and concise
argument with appropriate citations); Tong, 25 S.W.3d at 710; Jackson
v. State, 50 S.W.3d 579, 591 n.1 (Tex. App.CFort Worth 2001, pets. ref=d).

Grotti contends that Dr.
Zimmerman=s opinions
were based on conjecture.  However, Dr.
Zimmerman testified that her opinions were based on McGhee=s medical records, affidavits from JPS employees, letters and
information from the Board, and her education, training, and expertise.  Considering Dr. Zimmerman=s stated basis for her opinion, other legally sufficient evidence
corroborating Dr. Zimmerman=s opinion, and Dr. Zimmerman=s own specialized medical knowledge, Dr. Zimmerman=s testimony was not based upon conjecture.








The factual background and
sufficiency sections above demonstrate the complexity of the evidence involved
in this case.  An understanding of the
relevant medical terms and concepts, such as agonal respiration, spinal reflex,
metabolic acidosis, ventricular fibrillation, ventricular tachycardia, and
pulseless electrical activity, is beyond the common knowledge of the average
juror.  Dr. Zimmerman=s testimony describing and explaining McGhee=s condition during and after the code assisted the fact-finder in
making its determination of the relevant issues.  Grotti provides no authority supporting her
argument that an expert=s opinion is
conjecture merely because there is an abundance of evidence to the
contrary.  Further, Dr. Zimmerman
specifically identified the limitations of her opinion.  That is, she conceded that she was Aassuming@ that McGhee
was breathing, a key unknown fact.  Thus,
the jury was made aware of the assumption upon which her opinion was
based.  Accordingly, notwithstanding our
factual sufficiency holding above, Dr. Zimmerman=s conclusion that McGhee was alive at 21:50 was based on more than
mere subjective belief or unsupported speculation.  See Daubert, 509 U.S. at 590, 113 S.
Ct. at 2795.  The trial court did not
abuse its discretion by admitting Dr. Zimmerman=s testimony.  Accordingly, we
overrule Grotti=s sixth
issue.

VII.  Double Jeopardy








In her seventh issue, Grotti
argues that her prosecution violated the Fifth Amendment=s prohibition against double jeopardy. 
The Board investigated the circumstances surrounding McGhee=s death and ultimately ordered Grotti to pay an Aadministrative penalty@ in the amount of $10,000 in addition to revoking her medical license
and requiring her to reimburse the Board for costs incurred in preparation of
the hearing transcript.  Grotti contends
that the administrative penalty implicates the constitutional protection
against double jeopardy because it is punitive in nature and not remedial, and
therefore constitutes criminal Apunishment@ for double
jeopardy purposes.  Consequently, she
argues that the State should have been barred from prosecuting her for murder
because she had previously been subject to statutory Apunishment@ pursuant to
the Texas Occupations Code.  See Tex. Occ. Code Ann. ' 164.052 (Vernon Supp. 2006), ' 164.053 (Vernon
2004).  The State responds that (1)
application of the Blockburger test demonstrates that the offenses are
not the same and (2) the $10,000 administrative penalty was not criminal Apunishment.@[23]








The double jeopardy clause of
the United States Constitution provides that no person shall be subjected to
twice having life or limb in jeopardy for the same offense.  U.S.
Const. amend. V.  It bars three
separate types of double jeopardy claims: (1) a second prosecution for the same
offense after acquittal; (2) a second prosecution for the same offense after
conviction; and (3) multiple punishments for the same offense.  Brown v. Ohio, 432 U.S. 161, 165, 97
S. Ct. 2221, 2225 (1977); Ex parte Herron, 790 S.W.2d 623, 624 (Tex.
Crim. App. 1990) (op. on reh=g).  These double jeopardy
protections apply only when the duplicative prosecutions or punishments involve
the Asame offense.@  Ex parte Broxton, 888 S.W.2d 23, 25
(Tex. Crim. App. 1994), cert. denied, 515 U.S. 1145 (1995).  Grotti argues that her double jeopardy claim
implicates the second and third categories.

Texas courts apply the same-elements
test articulated by the United States Supreme Court in Blockburger v. United
States, 284 U.S. 299, 52 S. Ct. 180 (1932), when reviewing a double
jeopardy claim.  See Langs v. State,
183 S.W.3d 680, 685 (Tex. Crim. App. 2006). 
This is achieved by examining the elements of the applicable statutes to
determine whether each statute Arequires proof of an additional fact which the other does not.@  See Blockburger, 284
U.S. at 304, 52 S. Ct. at 182.  If each
statute requires proof of an additional fact that the other does not, then the
two offenses are not the same offense for double jeopardy purposes.  Id. 









We begin by recognizing that
legislative intent is the primary consideration in a multiple punishment double
jeopardy claim and the Aultimate end
that the >same
elements= test seeks.@  Langs, 183 S.W.3d at 685 n.15, 688; Saenz
v. State, 166 S.W.3d 270, 272 (Tex. Crim. App. 2005) (AThe Fifth Amendment=s multiple punishments prohibition is violated when a defendant >is convicted of more offenses than the legislature intended.=@).  AThe assumption underlying the rule is that [the legislature]
ordinarily does not intend to punish the same offense under two different
statutes.@  Whalen v. United States, 445 U.S. 684,
691-92, 100 S. Ct. 1432, 1437-38 (1980). 








Here, disciplinary
proceedings were initiated against Grotti pursuant to the Medical Practice Act
(AMPA@).  See Tex.
Occ. Code Ann. '' 151.001-165.160  (Vernon 2004 & Supp.
2006).  The Board=s order indicates that McGhee Acommitted@ a Aprohibited act or practice@ pursuant to sections 164.052(a)(5) and 164.053(a)(1) of the MPA,
which fall under the subtitle, ALicense Denial and Disciplinary Actions.@  Id. '' 164.052(a)(5), 164.053(a)(1). 
Section 165.160, titled AEffect on Criminal Prosecution,@ states, AThis
subtitle does not bar a criminal prosecution for a violation of this subtitle
or a rule adopted under this subtitle.@  Id. ' 165.160.  Thus, we initially
note that the legislature clearly did not intend this administrative procedure
to be a bar to criminal prosecution.  Likewise, application of Blockburger=s same-elements test further reveals that the legislature did
not intend that the Aoffenses@ be the same.  Section
164.052(a)(5) provides that A[a] physician . . . commits a prohibited practice if that person . . .
commits unprofessional or dishonorable conduct that is likely to deceive or
defraud the public, as provided by Section 164.053, or injure the public.@  Id. ' 164.052(a)(5).  The Board
included the following in its conclusions of law:  

3.  Respondent [Grotti] committed a prohibited
act or practice within the meaning of Section 164.052(a)(5) of the Act based
upon unprofessional or dishonorable conduct that is likely to deceive or
defraud the public or injure the public. 
Respondent=s act
of unprofessional conduct was her occlusion of [McGhee=s]
endotracheal tube.

 

Section 164.053(a)(1) provides that A[f]or purposes of Section 164.052(a)(5), unprofessional or dishonorable
conduct likely to deceive or defraud the public includes conduct in which a
physician . . . commits an act that violates any state or federal law if the
act is connected with the physician=s practice of medicine.@  Id. ' 164.053(a)(1).  The Board
included the following in its conclusions of law:

4.  Respondent has committed a prohibited act or
practice within the meaning of Section 164.053(a)(1) of the Act based on
Respondent=s
commission of an act that violates any law of this state if the act is
connected with Respondent=s
practice of medicine to wit: Respondent violated the Health and Safety Code
Section 671.001 by failing to apply the statutory requirements for determining
death with regard to [McGhee].

 








On the other hand, the
indictment, which tracks the relevant penal code statute, charges Grotti with
the offense of murder and states that Aon or about December 26, 2000,@ Grotti Adid then and
there unlawfully, intentionally, and knowingly cause the death of [McGhee] . .
. by occluding the airway of [McGhee] with her finger.@  It further provides that Aon or about December 26, 2000,@ Grotti Adid then and
there unlawfully intend to cause serious bodily injury to [McGhee] . . . and
did cause the death of [McGhee] by intentionally and knowingly committing an
act clearly dangerous to human life, namely occluding the airway of [McGhee]
with her finger.@[24]








The elements of the criminal
offense and the prohibited acts under the MPA are different.  A violation of section 164.052(a)(5) requires
that a physician commit a prohibited practice. 
The murder offense is not limited to physicians.  A section 164.052(a)(5) violation requires
that the physician commit unprofessional or dishonorable conduct.  The murder offense does not require this form
of conduct.  The same MPA-prohibited act
requires that the conduct deceive or defraud the public.  The murder offense does not require deception
or fraud.  A violation of section
164.053(a)(1) requires that the prohibited act be connected with the physician=s practice of medicine.   The
murder offense does not require any connection with the practice of
medicine.  Further, the murder offense
requires that the defendant intentionally or knowingly cause death or commit an
act clearly dangerous to human life, but the MPA-prohibited acts contain no
scienter requirement.  Because each Aoffense@ requires
proof of an additional fact that the other does not, the Aoffenses@ are not the
same.  See Blockburger, 284 U.S.
at 304, 52 S. Ct. at 182.













Grotti does not discuss
whether the Aprohibited
act[s] or practice[s]@ that she Acommitted@ under the
occupations code and the criminal offense that she was indicted for are the Asame offense.@  As indicated above, Grotti=s double jeopardy argument is based entirely on the theory that the
$10,000 administrative penalty assessed against her constitutes criminal
punishment, citing Hudson v. United States, 522 U.S. 93, 118 S. Ct. 488
(1997).  Indeed, Hudson sets forth
the proper inquiry for determining whether a civil penalty constitutes Apunishment@ for
purposes of double jeopardy.  See id.
at 99, 118 S. Ct. at 493; see also Ex parte Ward, 964 S.W.2d 617, 620
(Tex. Crim. App.), cert. denied, 525 U.S. 823 (1998).  This court and others, however, have
recognized that the analysis of a multiple punishments claimCat least in terms of the situation in which the alleged criminal
conduct violates two separate statutory provisions[25]Cbegins by determining whether the punishments are for the same
offense.  See Ex parte Tharp, 912
S.W.2d 887, 889 (Tex. App.CFort Worth 1995), aff=d, 935 S.W.2d 157 (Tex. Crim. App. 1996) (ABecause the statutes describe the >same offense= under the Blockburger
test, if the driver=s license
suspension . . . was punishment, then a subsequent prosecution for driving
while intoxicated will be barred by double jeopardy.@); see also Langs, 183 S.W.3d at 685 (AThis Court adopted the Blockburger test long ago, and we
continue to apply it as the first means of analyzing a multiple-punishment
double-jeopardy claim when the legislature=s intent is not clearly expressed.@); Johnson v. State, 920 S.W.2d 692, 693-94 (Tex. App.CHouston [1st Dist.] 1996, pet. ref=d) (applying Blockburger test to appellant=s criminal Apunishment@ argument).  Because the
criminal offense and MPA-prohibited acts are not the same offenses for double
jeopardy purposes, we need not determine whether the Aadministrative penalty@ levied against Grotti constitutes criminal Apunishment.@  See Ex parte Mitchell, No.
05-01-00213-CR, 2001 WL 579931, at *2 (Tex. App.CDallas May 31, 2001, no pet.) (not designated for publication)
(denying appellant=s
application for pretrial writ of habeas corpus because elements of criminal
offense and administrative offense different). 
Accordingly, Grotti=s subsequent murder prosecution did not violate the Fifth Amendment=s prohibition against double jeopardy. 
We overrule Grotti=s seventh
issue.

VIII.  Conclusion

Having sustained Grotti=s first issue, we reverse the trial court=s judgment and remand this case for a new trial.  See Watson, 2006 WL 2956272, at *7;
Clewis v. State, 922 S.W.2d 126, 133-34 (Tex. Crim. App. 1996).

 

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL A:   CAYCE,
C.J.; LIVINGSTON and GARDNER, JJ.

 

PUBLISH

 

DELIVERED:  November 17, 2006

 











[1]Janice
Zimmerman, M.D., an expert witness who testified for the State, described a Acode@ as a
resuscitation effort.  A[I]n
simplified terms . . . you have a patient who has a condition that if you don=t do
something they probably are likely to die. 
But you have an opportunity to intervene and reverse that process or
treat it effectively.@





[2]Like
McGhee=s
medical records, all time references in this opinion are based on a 24-hour
clock. 





[3]James
Cox, M.D., an expert witness who testified on behalf of Grotti, described a
cardiac arrest as a complete stopping of the heart, causing respiratory and
circulatory failure.  A heart attack,
conversely, occurs when there is Ablockage of an artery in the
heart and a piece of heart muscle dies,@ but the heart continues to
beat.





[4]V-fib
is chaotic or irregular electrical activity of the heart in which the heart
pulsates, but does not beat, pump, or perfuse. 
Ventricular tachycardia (AV-tach@) and
pulseless electrical activity (APEA@) are
other forms of irregular electrical heart activity.





[5]A
person=s
breathing is Aspontaneous@ when
the body itself is doing the breathing without the assistance of artificial
machines, that is, when the breathing is self-generated. 





[6]This
is generally referred to as a Aflat line@; the
heart is doing nothing.





[7]A
pulse is Apalpable@ when
it can be felt, usually on the carotid or femoral artery.





[8]A Asinus@
rhythm is a normal heart rhythm. 
According to Dr. Cox, although a sinus rhythm suggests a pulse and a
heartbeat, it does not demonstrate effective perfusion, which indicates that
the heart is effectively pumping blood to the organs and tissues.





[9]Grotti
was one of two attending physicians in the JPS ICU at the time. She had
attended the University of Texas=s medical school in Houston
and had completed a family practice internship, an internal medicine residency,
and a critical care fellowship thereafter. 
She worked in Sacramento, California as a hospitalist after her
fellowship.  She began working at JPS on
August 1, 1997.  At the time of the
event, Grotti was board certified in internal medicine and critical care.





[10]AThready,@
according to Grotti, means weak.





[11]ABrady@ is
short for Abradycardia,@
which means a slower heart rate, usually less than sixty beats per minute.  Grotti explained that she wrote Abrady@
because McGhee=s Aheart
rate was bradying down, it was slowing down.@





[12]Life
Gift is an organization that assists with the process of organ donation.





[13]Webster=s
Dictionary defines Aocclude@ as Ato
shut or stop up so as to prevent the passage of something.@  Webster=s Third New International Dictionary 1560
(2002). 





[14]Grotti
initially argues that a different evidentiary standard of review should be
utilized in cases in which a physician has been charged with negligent homicide
arising from the treatment of a patient. 
She contends that we should apply the no-evidence standard of review
pronounced by the Texas Supreme Court in City of Keller v. Wilson
because there is no precedent in Texas for the application of the evidentiary
sufficiency rules to cases in which physicians are charged with homicide.  168 S.W.3d 802 (Tex. 2005).  We decline Grotti=s
recommendation.  This is an appeal from a
criminal prosecution, not a civil trial, and until further instructed, we are
bound to apply the appropriate standards of review as articulated by the court
of criminal appeals as set forth herein. 
See Tello v. State, 180 S.W.3d 150, 156 (Tex. Crim. App.
2005).   





[15]The
penal code provides that A>[d]eath,=
includes, for an individual who is an unborn child, the failure to be born
alive.@  Tex.
Penal Code Ann. '
1.07(a)(49).





[16]Section
671.001 provides guidance to physicians, and others relying on those physicians=
pronouncements, as to when death legally occurs in this state.  See Tex.
Health & Safety Code Ann. ' 671.001; Tarrant County
v. Dobbins, 919 S.W.2d 877, 883 (Tex. App.CFort
Worth 1996 writ denied) (holding that medical investigator was entitled to rely
on doctors=
pronouncement of death under section 671.001); see also Tex. Health & Safety Code Ann. '
671.002(b) (providing that Aperson who acts in good faith
in reliance on a physician=s or registered nurse=s
determination of death is not liable for civil damages or subject to criminal
prosecution for the person=s actions.@).





[17]Grotti
argues in her brief, and we agree, that section 671.001(a), not section
671.001(b), is the appropriate definition of death by which to examine the
sufficiency of the evidence because this is a case of cardiopulmonary death,
not brain death, and because we are restrained by the theories and definitions
used at trial when conducting our sufficiency reviews.  See Gollihar, 46 S.W.3d at 253; Malik,
953 S.W.2d at 240.





[18]According
to the report, AC@
stands for critical.





[19]Hunt
is certified in Advanced Cardiac Life Support (ACLS), Cardiopulmonary
Resuscitation (CPR), Pediatric Advanced Life Support (PALS), and Neonatal
Advanced Life Support (NALS).





[20]The
timing testified to by Dr. Kasschau conflicts with other evidence showing that
Grotti occluded McGhee=s ET
tube an hour after she called the code, or 21:50.  Regardless of the inconsistency in the times,
however, there is no dispute that Grotti occluded the ET tube after calling the
code and with Dr. Kasschau present in the room.





[21]Although
not entirely on point, the court in State v. Naramore, 965 P.2d 211
(Kan. Ct. App. 1998), considered some of the same issues that we are confronted
with in this case, particularly the strong expert testimony contrary to the
fact finder=s
verdict.  There, the Kansas appellate
court held that the evidence was insufficient to support the
physician-defendant=s
convictions for murder.  Id. at
223.  The court stated,

 

This
is not a situation where the evidence in the defendant=s
favor is trifling.  It is extremely
strong.  When there is such strong
evidence supporting a reasonable, noncriminal explanation for the doctor=s
actions, it cannot be said that there is no reasonable doubt of criminal
guilt.  This is particularly true in a
situation as we are faced with here, where the only way the defendant=s
actions may be found to be criminal is through expert testimony, and that testimony
is strongly controverted in every detail.

 

We do
not say that a physician can always escape criminal conviction for reckless or
purposeful homicidal behavior through friendly medical testimony on his or her
behalf.  But there is a reason why there
has yet to be in Anglo-American law an affirmed conviction of a physician for
homicide arising out of medical treatment based on such highly controverted
evidence as here.

 

Id. at
223-24. 





[22]We
also note that Grotti=s
argument under her third issue seems to be a challenge, though not worded as
such, to the jury charge.  Grotti appears
to be advocating that the requirements for expert testimony and a
physician-based standard of care in a civil medical malpractice case be applied
in this case.  There, expert testimony is
required to establish the governing standard of care and to determine whether
the standard has been breached.  See
Hood v. Phillips, 554 S.W.2d 160, 165-66 (Tex. 1977).  But here, Grotti did not assert any objection
to the trial court=s
charge as worded, which was based upon the penal code=s
definition of gross deviation from the standard of care.  This definition provided that the risk that
the defendant fails to perceive must Aconstitute[] a gross
deviation from the standard of care that an ordinary person would exercise
under all the circumstances as viewed from the actor=s
standpoint.@  Tex.
Penal Code Ann. '
6.03(d); Tello, 180 S.W.3d at 156. 
To the extent that Grotti makes this argument, it is unclear and
waived.  See Tex. R. App. P. 38.1(h); Tong v.
State, 25 S.W.3d
707, 710 (Tex. Crim. App. 2000), cert. denied, 532 U.S. 1053
(2001).  Further, we cannot say that any
unobjected-to charge error existed since the trial court=s charge tracked the law applicable
to the case.  See Tex. Code Crim. Proc. Ann.
arts. 36.14-.15 (Vernon Supp. 2006), arts. 36.16-.19 (Vernon 1981); Bluitt
v. State, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004); Almanza v. State,
686 S.W.2d 157, 171‑72 (Tex. Crim. App. 1985) (op. on reh=g). 





[23]Grotti
filed a pretrial motion to dismiss the indictment on the same grounds, which
the trial court denied.  She does not argue
that her prosecution violates the double jeopardy provision found in article I,
section 14 of the Texas Constitution.  Tex. Const. art. I, ' 14.





[24]We
compare the offense charged, murder, as opposed to the offense that Grotti was
convicted of, criminally negligent homicide, because Grotti sought to dismiss
the indictment pretrial on double jeopardy grounds.  Moreover, as we indicate below, Grotti does
not conduct a same-elements examination in her brief.  The State, however, does, arguing that a comparison
of the elements of the offenses considered in the administrative proceeding
with the elements of the offense contained in the indictment shows that Grotti
has not been subjected to double jeopardy.





[25]See
Vineyard v. State, 958 S.W.2d 834, 836 n.5 (Tex. Crim. App. 1998).